Thomas E. HOFFMEYER, Bruce B. Dunn and Bruce W. Gorsline

v.

LOEWEN GROUP INTERNATIONAL, INC. and Craig R. Bush.

No. A–01–4069.

United States Bankruptcy Court, D. Delaware.

March 20, 2002.

Thomas P. Leff, Casarino, Christman & Shalk, Wilmington, DE, Mark G. Ledwin, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY, for Plaintiffs.

Scott D. Cousins, Victoria Watson Counihan, Greenberg Traurig, LLP, Wilmington, DE, Sherry L. Katz–Crank, Miller, Canfield, Paddock and Stone, Lansing, MI, Co–Counsel for Bush.

William H. Sudell, Jr., Robert J. Dehney, Eric D. Schwartz, Michael G. Busenkell, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Richard M. Cieri, Richard I. Werder, Jr., Tracy K. Stratford, Jones, Day, Reavis & Pogue, Cleveland, OH, Gregory M. Gordon, Jones, Day, Reavis & Pogue, Dallas, TX, for Debtors and Debtors in Possession.

PETER J. WALSH, Bankruptcy Judge.

Dear Counsel:

This is with respect to the motion (Doc. # 14) of Thomas E. Hoffmeyer, Bruce R. Dunn and Bruce W. Gorsline (collectively, "Plaintiffs") for an order determining that this adversary proceeding is non-core. I will grant the motion for the reasons discussed below.

The Loewen Group International, Inc. ("LGII") and approximately 830 of its direct and indirect subsidiaries and/or affiliates (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 1, 1999 ("Petition Date").[1] (Pl.'s Mot. (Doc. # 14) at 2.) Debtors' chapter 11 cases were consolidated for procedural purposes and administered jointly. On December 5, 2001, Debtors' Fourth Amended Joint Plan of Reorganization ("Plan") was confirmed

---

1. Some of the Debtors filed for bankruptcy subsequent to June 1, 1999.

(Doc. # 8671, Case No. 99–1244).[2]

LGII's business operations primarily consist of funeral homes, cemeteries and related businesses. The instant adversary proceeding arises out of LGII's pre-petition purchase from Plaintiffs of six funeral homes located in and around Lansing, Michigan. Plaintiffs are Michigan residents and funeral directors duly licensed by the State of Michigan who, prior to February 21, 1996, each owned one-third of the shares of Gorsline–Runicman Co., a Michigan corporation engaged in the funeral home business in the Lansing, Michigan area. (Pl.'s Mot. (Doc. # 14) at 2.) On February 21, 1996, Plaintiffs entered into an agreement ("Merger Agreement") with LGII, pursuant to which LGII agreed to purchase all of Plaintiffs' shares in Gorsline–Runicman Co. for $13 million in cash and LGII stock at closing. (*Id.* at 3; Complaint ¶ 11.) In addition, the Merger Agreement provided for additional payments of approximately $7 million to Plaintiffs upon the occurrence of certain events ("Triggering Events").[3] (Complaint ¶ 19.)

At the closing of the Merger Agreement, LGII and Plaintiffs simultaneously executed another agreement ("Side Agreement" and collectively with the Merger Agreement, "Agreements"), pursuant to which Plaintiffs became entitled to receive money damages from LGII in the event that LGII still owned any cemeteries in Michigan ("Michigan Cemeteries") as of April 1996. (Bush Resp. (Doc. # 15) at 3.) Under Michigan law, a corporation that directly or indirectly owns or operates a cemetery is prohibited from directly or indirectly owning or operating a funeral home. (Complaint ¶ 14; M.C.L. § 339.1812 (2002) (the "Michigan Anti–Combination Law").) Plaintiffs had concerns regarding LGII's purported joint ownership of funeral homes and cemeteries in Michigan because a potential penalty for violating the Michigan Anti–Combination Law is the revocation or suspension of Plaintiffs' funeral directors licenses. (Complaint ¶ 14.) To address these concerns, the parties executed the Side Agreement which provides that the Triggering Events contained in section 1(d) of the Merger Agreement "shall be deemed to have occurred and be completely satisfied for all Measurement Periods if... (b) [LGII], as of February 21, 1997, owns any of the [Michigan] Cemeteries..." (Side Agreement at ¶ 1(b)). (Complaint ¶ 20.) The Side Agreement also provides that if LGII owned any of the Michigan Cemeteries between April 1996 and February 1997, LGII would pay Plaintiffs "Additional Payments" of $50,000.00 on April 12, 1996, $10,000 per month for the months of May 1996 through January 1997, and an additional $50,000.00 on February 21, 1997. (Side Agreement at ¶ 2; Complaint ¶ 21.) These obligations, in addition to those undertaken by LGII in connection with the Merger Agreement, were secured by three mortgages ("Mortgages") on the real property upon which the six Gorsline–Runicman funeral homes operate. (Pl.'s Mot. (Doc. # 14) at 3.)[4]

---

**2.** Nineteen of the Debtors were not included under the Plan due to unresolved litigation that remained pending at the time the Plan was filed. Four additional Debtors were not included because they had no impaired class voting to accept the Plan. *See* 11 U.S.C. § 1129(a)(10).

**3.** Pursuant to section 1(D) of the Merger Agreement, a Triggering Event was deemed satisfied if certain economic goals based upon the number of funeral calls, gross revenues and/or net cash flows were achieved by Gorsline–Runicman during the first three years following the closing of the Merger Agreement. (Complaint ¶ 19.)

**4.** Both the mortgages and the Agreements were negotiated and executed in Michigan and expressly provide that they are governed

Subsequent to the closing of the Agreements, Plaintiffs continued to be concerned with LGII's apparent continued involvement in the Michigan Cemeteries. (Complaint ¶ 25.) On or about April 24, 1997, Plaintiffs wrote a letter to Defendant Craig Bush ("Bush" or collectively with LGII, "Defendants") to express their concerns. (*Id.* at ¶ 26.) Bush, who is currently the managing member and sole owner of Meadco, LLC, a Michigan limited liability company that purportedly purchased certain Michigan Cemeteries from LGII, was at all times relevant to the negotiation and execution of the Agreements, an officer and employee of LGII, and a member of LGII's in-house legal staff. (Pl.'s Mot. (Doc. # 14) at 3.) During the negotiation of the Agreements, Bush allegedly represented to Plaintiffs that LGII would divest itself of the Michigan Cemeteries. (*Id.*) Neither Bush, nor anyone else from LGII responded to Plaintiffs' letter dated April 24, 1997. (Complaint ¶ 27.)

On April 30, 1997, the Michigan Funeral Directors Association ("MFDA") commenced an action ("MFDA Action") against LGII in Michigan state court alleging that LGII was in violation of the Michigan Anti–Combination Law. (*Id.* at ¶ 28.) The complaint was dismissed on procedural grounds in 1997 (*Id.* at ¶ 30, n. 2), but was later renewed with the Michigan Department of Consumer and Industry Services in December 2000.[5] (*Id.* at ¶ 46.).

On September 14, 2000, seventeen wholly owned debtor subsidiaries of LGII ("Michigan Debtors") commenced an adversary proceeding in this Court seeking declaratory and other relief concerning the Michigan Cemeteries allegedly owned and operated by LGII. (*APC Assoc., et al. v. Meadco, L.L.C., et al.*, Adv. Proc. No. 00–929; Complaint ¶ 35.) In their complaint, the Michigan Debtors allege that the Michigan Cemeteries were transferred by Michigan Debtors APC Association, OVC Association and Osiris Holdings of Michigan, Inc. to Meadco., LLC on April 17, 1996. (Complaint ¶ 36.) Plaintiffs believe that this and other allegations contained in the Michigan Debtors' verified complaint constitute admissions by LGII that it is the *de facto* owner of the Michigan Cemeteries. (*Id.* at ¶¶ 36–43.)

On May 31, 2001, Plaintiffs commenced the instant adversary proceeding seeking a declaratory judgment that LGII does in fact "own" certain Michigan Cemeteries and therefore, is obligated to Plaintiffs under the Agreements to the extent secured by the Mortgages filed in connection therewith. (*Id.* at ¶ 52.) In addition, Plaintiffs seek monetary damages from Bush for his alleged misrepresentations and omissions regarding LGII's purported divestiture of its Michigan cemetery holdings (*Id.* at ¶¶ 53–58), and for breach of his fiduciary duty to Plaintiffs, as shareholders and partners of LGII, to refrain from making such material misrepresentations and omissions (*Id.* at ¶¶ 59–62).[6] LGII filed a motion (Doc. # 4) to dismiss the Complaint on July 9, 2001. On October 1, 2001, Plaintiffs filed the instant motion (Doc. # 14) seeking a determination that the proceeding is non-core.[7] Thereafter, on

by Michigan law. (Pl.'s Mot. (Doc. # 14) at 3–4.)

**5.** The relief sought by the MFDA effectively includes the revocation of Plaintiffs' funeral home licenses. (Complaint ¶ 46.)

**6.** Plaintiffs further demand a jury trial on all triable issues set forth in their complaint

("Complaint"). Plaintiffs do not consent to a jury trial in the Bankruptcy Court. (Complaint at 22.)

**7.** Plaintiffs simultaneously filed a motion (Doc. # 13) to withdraw the reference of the proceeding to this Court. Pursuant to Rule

December 5, 2001, Debtors' Plan was confirmed. (Order (Doc. # 8671, Case No. 99–1244).)[8] The Plan became effective on January 2, 2002. (Pl.'s Supp. Mem. (Doc. # 24) at 3.)

Plaintiffs argue that the instant adversary proceeding is non-core because the claims asserted herein arose pre-petition and constitute a traditional state law action that exists independently of LGII's bankruptcy case. (Pl's Mot. (Doc. # 14) at 7.) I agree. Although Defendants set forth several arguments as to why this action constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)[9], I find these arguments unpersuasive.

■■■ Section 157(b)(2) sets forth a nonexclusive list of core proceedings. Relevant to the instant action, § 157(b)(2)(A), (B), (G), (K) and (O) provide:

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims

against the estate for purposes of distribution in a case under title 11;

\*    \*    \*    \*    \*    \*

(G) motions to terminate, annul, or modify the automatic stay;

\*    \*    \*    \*    \*    \*

(K) determinations of the validity, extent, or priority of liens;

\*    \*    \*    \*    \*    \*

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2).[10] Although the ambiguity of subsections (A) and (O) has caused variations in the manner in which courts distinguish between core and non-core proceedings, the Third Circuit has held that "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Torkelsen v. Maggio (In re Guild and Gallery Plus, Inc.)*, 72 F.3d 1171, 1178 (3d Cir.1996) (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 267 (3d Cir.1991)). A proceeding is not "core" simply because it "arguably fits within the literal wording" of one of the listed proceedings under § 157(b)(2). *In re Lacy*, 183 B.R. 890, 893

5011(a) that motion is to be decided by the District Court.

**8.** The Plan provides in pertinent part:
Nothing contained in the Plan or this Confirmation Order shall be deemed to discharge, void or otherwise affect the liens, if any, and the rights and remedies connected therewith, of Thomas E. Hoffmeyer, Bruce B. Dunn and Bruce W. Gorsline under those certain real property mortgages given by the Debtors on or about February 21, 1996.

(Order Confirming Plan (Doc. # 8671, Case No. 99–1244) at 58, ¶ 12.)

**9.** 28 U.S.C. §§ 101 *et seq.* is hereinafter referred to as "§ ___".

**10.** Bush contends that the instant adversary proceeding is a core proceeding pursuant to § 157(b)(2)(A), (K) and (O). (Bush Resp. (Doc. # 15) at 6.) LGII contends that the proceeding is core pursuant to § 157(B), (G), and (K). (Debtors' Opp'n (Doc. # 16) at 2.)

(Bankr.D.Colo.1995); *see also Southeastern Sprinkler Co. v. Meyertech Corp. (In re Meyertech Corp.)*, 831 F.2d 410, 416 (3d Cir.1987) ("It is difficult to perceive of a proceeding which would not fall under the all-encompassing language of either § 157(b)(2)(A) or § 157(b)(2)(O), but we are cautioned that an expansive interpretation of these provisions may lead to some seemingly incorrect and overbroad results regarding core proceedings"). Rather, to be a core proceeding, "an action must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment although of necessity there may be a peripheral state law involvement." *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.*, 107 B.R. 34, 40 (D.Del.1989) (quoting *Acolyte Elec. Corp. v. City of New York*, 69 B.R. 155, 173 (Bankr.E.D.N.Y. 1986)). As the Fifth Circuit stated in *In re Wood*, 825 F.2d 90 (5th Cir.1987),

> [i]f the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be *related* to

the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

*Id.* at 97, *quoted in Torkelsen*, 72 F.3d at 1178. Such is the case here.

While Defendant Bush admits that the claims asserted against him are non-core, he contends that such claims should be consolidated with the "core" claims asserted against LGII. (Bush Resp. (Doc. # 15) at 2.) Bush argues that the claims asserted against LGII constitute "core" claims pursuant to § 157(A), (K), and (O) because, respectively: (1) subsection (A) provides that core proceedings are not limited to matters concerning the administration of the estate;[11] (2) this action seeks to resolve the extent of LGII's liability to Plaintiffs on a pre-petition contract and therefore, Plaintiffs are essentially asking this Court to determine the amount of LGII's liability on an allegedly secured claim;[12] and (3) this proceeding affects the liquidation of the assets of LGII's estate ("Estate") because Plaintiff seeks $ 17 million in liquidated and compensatory damages, in addition to punitive damages, which will

---

**11.** In support of this argument, Bush cites several cases in which courts found that certain pre-petition breach of contract claims, where related to the bankruptcy case, constituted core proceedings under § 157(b)(2). I find these cases to be inapposite. *See In re Meyertech*, 831 F.2d at 410–12 (finding action for breach of contract to constitute a claim against debtor's bankruptcy estate and therefore, a core proceeding pursuant to § 157(b)(2)(B)); *In re L.B. Trucking, Inc.*, 90 B.R. 81, 84 (Bankr.D.Del.1988) (finding debtor's counterclaim to be a core matter because it constituted a counterclaim by the estate against a creditor's claim against the estate); *Glassel v. Allegheny Int'l Credit Corp.*, 111 B.R. 495, 498 (W.D.Pa.1990) (finding determination on allowability of Plaintiffs' claim to be a core matter); *In re FRG, Inc.*, 121 B.R. 710, 716 (Bankr.E.D.Pa.1990) (entering order to dismiss complaint and finding that the court had no jurisdiction over claims for rack-

eteering, fraud, negligence, breach of fiduciary duty, conspiracy and breach of contract asserted by Plaintiffs against non-debtors); *Neuner v. C.G. Realty Capital Ventures–I.L.P. (In re Sharps Run Assoc., L.P.)*, 157 B.R. 766 (D.N.J.1993); *In re A. Barletta & Sons*, 1993 WL 592617, *3, 1993 Bankr.Lexis 2095, *7 (Bankr.M.D.Pa.1993) (finding that movants failed to persuade court to abstain from hearing objections to proofs of claims for breach of contract and warranty damages).

**12.** In support of this argument, Bush notes that Plaintiffs have characterized this action as concerning the validity of the mortgages granted to Plaintiffs by LGII' in their brief submitted in response to LGII's motion (Doc. # 4) to dismiss. (Bush Resp. (Doc. # 15) at 7.) However, I find Plaintiffs' characterization of the action in the context of LGII's motion to dismiss to be irrelevant.

be paid out of the Estate's assets.[13] (*Id.* at 6–7.) In addition, Defendant LGII argues that this proceeding is core pursuant to § 157(b)(2)(B) and (G) because the action: (1) effectively seeks a determination of the allowance of Plaintiffs' secured claim against the Estate; and (2) constitutes an action which effectively seeks a modification of the automatic stay.[14] (Debtors' Opp'n (Doc. # 16) at 3–4.) I find each of these arguments unpersuasive.[15]

■ The instant proceeding neither invokes a substantive right provided by title 11, nor constitutes a proceeding which could only arise in the context of a bankruptcy case. *See Torkelsen,* 72 F.3d at 1178. The claims asserted herein constitute traditional state law causes of action sounding in tort, contract and property law which arose prior to the petition date. Plaintiffs' claims depend in no way on an interpretation of the Bankruptcy Code and could have been brought prior to and independent of Debtors' bankruptcy. As such, I find the instant proceeding to be non-core. *See Beard v. Braunstein,* 914 F.2d 434, 443 (3d Cir.1990) ("It is clear that to the extent that the claim is for pre-petition contract damages, it is non-core."); *In re Donington, Karcher, Salmond, Ronan & Rainone, P.A.,* 194 B.R. 750, 758 (D.N.J. 1996) (finding proceeding to be non-core because the state contract and tort claims involved "pre-petition conduct, relate only peripherally to the bankruptcy itself, and involve no substantive right in bankruptcy"); *Mellon v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.),* 122 B.R. 887, 894 (D.Del.1991) (finding state law claims which existed prior to and independent of the filing of debtor's bankruptcy to be non-core); *Hatzel,* 107 B.R. at 39 (finding proceeding to be non-core "because the state contract and tort claims do not involve any interpretation of the Bankruptcy Code and are not otherwise related to the underlying bankruptcy proceeding").[16]

13. Plaintiff seeks approximately $7 million in damages from LGII and $10 million from Bush. (Complaint at 22.) However, Bush contends that the claims asserted against him pertain to his official capacity as a former Assistant General Counsel and officer of LGII and therefore, to the extent Bush if found to have acted in his official capacity, LGII is responsible for any judgment rendered against him. (Bush Resp. (Doc. # 15) at 2.) Bush also contends that LGII will assume responsibility for any judgment against Bush whether in his individual or official capacities pursuant to the pending Motion to Approve Sale of Michigan Cemeteries. (*Id.*) There is nothing in the record to support or these contentions.

14. LGII also makes the same argument made by Bush with respect to why this action constitutes a "core" proceeding pursuant to § 157(b)(2)(K). (Debtors' Opp'n (Doc. # 16) at 2–3.)

15. Bush also implies that the simple fact that Plaintiffs referenced adversary proceedings and statements made within the context of Debtors' bankruptcy in the Complaint demonstrates that the instant proceeding is core. (Bush Resp. (Doc. # 15) at 3–5.) I disagree. These references have been made simply to support the allegations made in the Complaint. They do not constitute an admission that this proceeding is core and in fact, have no bearing on the determination of the issue.

16. LGII attempts to distinguish these cases on the ground that the claims in the instant adversary proceeding, in contrast to the cases cited, have been asserted against a debtor, and argues that Plaintiffs have cited no cases involving claims asserted against a debtor's estate. (Debtors' Opp'n (Doc. # 16) at 6.) I find this argument to be unpersuasive. First, there is nothing in the Bankruptcy Code or Third Circuit case law which provides that the party against whom a claim is asserted should be a factor in determining whether a proceeding is core or non-core. In addition, this is not a situation involving claims asserted against a debtor's estate. The Plan, which has already become effective, specifically provides that any liens held by Plaintiffs survive LGII's bankruptcy. Therefore, any claims held by Plaintiffs on account of the Mortgages may

Contrary to Defendants' contentions, this action cannot be characterized as one which seeks (i) the determination of the validity of a lien, (ii) the allowance of a secured claim against the Estate, or (iii) a modification of the automatic stay. Although it is true that the outcome of this proceeding may have some effect on LGII's bankruptcy case due to the fact that LGII may be liable to Plaintiffs for damages arising out of its pre-petition conduct, *see Marcus Hook,* 943 F.2d at 264 ("A proceeding is related to bankruptcy if *'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"*) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)), the proceeding will not effect Debtors' claims processes or their bankruptcy cases in general. *See Donington,* 194 B.R. at 759 (" 'subsection (O) does not render a proceeding core merely because the resolution of the action results in more, or less, assets in the estate.'") (quoting *In re Baranello & Sons, Inc.,* 149 B.R. 19, 25 (E.D.N.Y.1992)). Plaintiffs withdrew their proof of claim as of right prior to the commencement of this action. Therefore, Plaintiffs' alleged "claim" constitutes a legal nullity for the purposes of Debtors' bankruptcy and is completely governed by state law. *See Smith v. Dowden,* 47 F.3d 940, 943 (8th Cir.1995) (holding that creditors' withdrawal of proof of claim before trustee was able to commence fraudulent transfer proceeding against them rendered their withdrawn claim a legal nullity, not effective to waive defendants' Seventh Amendment right to a jury trial). In addition, the Plan, effective as of January 2, 2002, expressly provides that any liens held by Plaintiffs ride through Debtors' bankruptcy case unaffected. Therefore, whether or not this action could have ever been characterized as one seek-

now be asserted against reorganized LGII,

ing to modify the automatic stay or seeking the allowance of a claim against the *Estate,* the issue is now moot. The stay no longer applies and therefore, Plaintiffs may seek to enforce their alleged liens in state court against reorganized LGII outside the context of Debtors' bankruptcy.

For the reasons discussed above, I find the instant adversary proceeding to be non-core. Therefore, Plaintiffs' motion (Doc. # 14) for a determination that this adversary proceeding is non-core is *granted.*

SO ORDERED.

not the former bankruptcy estate.